**\*NOT FOR PUBLICATION\***

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE 388 ROUTE 22 READINGTON HOLDINGS, LLC,<br><br>Debtor. | Civil Action No. 3:20-cv-01252<br><br>**OPINION** |
| SB BUILDING ASSOCIATES LIMITED PARTNERSHIP,<br><br>Appellant,<br><br>v.<br><br>BUNCE ATKINSON, CHAPTER 7 TRUSTEE FOR 388 ROUTE 22 READINGTON HOLDINGS, LLC<br><br>Appellee. | |

**WOLFSON, Chief Judge**:

This matter concerns the validity of a sale of real property, which was an asset in a bankruptcy estate. SB Building Associates Limited Partnership ("SB"), the sole equity member of 388 Route 22 Readington Holdings, LLC (the "Debtor"), has appealed an order entered by the United States Bankruptcy Court for the District of New Jersey ('Bankruptcy Court") approving the auction sale of 388 Route 22, Readington, New Jersey ("the Property"). Presently before the Court is trustee Bunce D. Atkinson's ("Atkinson" or "the Trustee") motion to dismiss the appeal on the grounds that it is mooted by 11 U.S.C. § 363(m). For the following reasons, the motion is **GRANTED**, and the appealed is **DENIED**.

1

**I.     BACKGROUND AND PROCEDURAL HISTORY**

The Court sets forth only the facts from the record relevant to the parties' dispute over the validity of the sale. The Debtor filed for bankruptcy on July 31, 2013. SB is the sole equity member of the Debtor, and Atkinson is the court-appointed trustee for the Debtor's Property. Iron Mountain, the mortgagee on the Property, obtained a judgment of foreclosure in July 2011, but negotiated a temporary stay with Atkinson to sell it. Atkinson hired David Zimmel ("Zimmel") to do so. However, Zimmel was unsuccessful, soliciting only one offer in six months for $5 million. Atkinson rejected the offer because the foreclosure stay would expire during the prospective buyer's 45-day due diligence period. Iron Mountain and Atkinson then agreed to an auction, and on December 17, 2019, Leon Kitovsky ("Kitovsky") purchased the Property for $3.2 million. *See* Mot. to Dismiss, Ex. A. The auction proceeds satisfied Iron Mountain's mortgage, all administrative and priority claims, and all unsecured creditors. SB also received $100,000. Nevertheless, SB filed a motion before the Bankruptcy Court objecting to the sale.

Following arguments on that motion, the Bankruptcy Court approved the sale from the bench. *See* Dkt. 118. The court first determined that the Trustee exercised sound business judgment when he rejected the $5 million private offer, and instead, sold the Property at an auction. That determination was "simple, . . . because the sale [paid] all uncontested secured claims . . . and unsecured creditors in full. It [] also salvaged something from nothing, in the sense that Iron Mountain already had a stay relief and [was] still permitting the Trustee to conduct the sale to allow the opportunity to pay creditors other than [itself]." *Id.* Indeed, "Iron Mountain was under no obligation to grant the Trustee any time whatsoever" to sell the Property. *Id.*

Next, relying on *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147-50 (3d Cir. 1986), the Bankruptcy Court determined that the Kitovsky purchased the Property for value. The

2

court rejected SB's contention that the $5 million private offer better establishes the Property's value, classifying the offer as "illusory," because it was not signed by both parties, and found that, in any event, it "contained two substantial, perhaps insurmountable contingencies." *Id.* The first contingency required the Property to gain access to the public sewage system to supplement its small septic tank, which can currently only service 30 people. Without such access, the Property is unfit for industrial use or commercial development. The satisfaction of that contingency, in turn, depends on the outcome of an ongoing litigation that has been pending for many years. The other contingency required the Property to receive an exemption under local zoning ordinances for a legal non-conforming use, which likewise is a significant hurdle.

The Bankruptcy Court then rejected SB's contention that the Property was undervalued because the auction was held during the December 2019 holiday season. First, the court found that SB failed to "object by the deadline stated in the notice," which it received at least a month before the auction. *Id.* Second, the auction in fact "generated significant interest." *Id.* For example, seventy-seven prospective buyers registered, twenty-two inspected the Property, and fifteen delivered $150,000 to the auctioneer to bid. *Id.* Similarly, the Bankruptcy Court rejected SB's contention that the auction was procedurally deficient because of the low number of active bidders, as that was merely "a function of the Trustee's strategy to set the opening bid high." *Id.*

The Bankruptcy Court next addressed SB's contention that the auction price is inadequate, because the record lacks an appraisal. SB relied on *In re Perona Bros., Inc.*, 186 B.R. 833 (D.N.J. 1995), arguing that the district court in that case remanded the matter to the bankruptcy court solely because there was no appraisal in the record by which to measure the auction price. The Bankruptcy Court, however, found SB's position to be "far too broad a reading of *Perona*." Dkt. 118. Specifically, the court reasoned that SB disregarded the evidence of collusion in *Perona*,

which called into question the good faith of the purchaser and ultimately led to "irregularity in the auction price." *Id.* The court also rejected SB's contention that the auctioneer misled prospective buyers as to the Property's sewage capacity by failing to mention the related, yet still pending, sewage litigation. The court explained that the auctioneer stated only that the Property operates on a septic tank, which was a "true statement" both then and now, and that the representation simply reflected the "as-is condition." *Id.* As such, "it would not have been appropriate to delve into the details of litigation that has been ongoing for eight years." *Id.*

Finally, the Bankruptcy Court rejected a certification from Lawrence Berger ("Berger"), the general partner in the limited partnership which controls SB and one of SB's lawyers, representing that the Debtor received two $7 million offers in 2014—which offers were contingent upon the successful resolution of the sewage litigation—that better reflect the value of the Property. Noting that Iron Mountain obtained its foreclosure judgment nine years ago, the court emphasized that "Berger [did] not say that, as of today or any time in the immediate future, it is certain the Debtor will prevail," and "it is detrimental to all creditors to have to wait until endless litigation is pursued." *Id.* The Bankruptcy Court, accordingly, held that "a properly advertised and actively participated-in auction produce[d] the best possible measure of fair value," and "[t]he record amply supports approval of th[e] sale." *Id.*

Dissatisfied with the Bankruptcy Court's ruling, SB filed an emergency appeal before this Court and the Third Circuit Court of Appeals to stay the sale; both were denied. *See* Mot. to Dismiss, Ex. C. Thereafter, SB filed a Notice of *Lis Pendens* with the county land office declaring its interest in the Property, and continued to proceed with this appeal. *See* Mot. to Dismiss, Ex. E. Atkinson now moves to dismiss the appeal, contending that it is moot under 11 U.S.C. § 363(m). SB asks the Court to remand with instructions to the Bankruptcy Court to further develop the

4

factual record.

## II. STANDARD OF REVIEW

District courts have mandatory jurisdiction to hear appeals "from final judgments, orders, and decrees" entered by Bankruptcy Courts, such as the sale order in the present case. 28 U.S.C. § 158(a)(1). The primary issue on appeal here, *i.e.*, the Bankruptcy Court's finding that Kitovsky acquired the Property for value within the meaning of § 363(m), is a factual finding that is reviewable only for clear error. *Abbotts Dairies*, 788 F.2d at 147; *In re Pursuit Capital Mgmt. LLC*, 874 F.3d 124, 135 (3d Cir. 2017); *Universal Minerals v. C.A. Hughes & Co.*, 669 F.2d 98, 103 (3d Cir. 1981).

## III. DISCUSSION

11 U.S.C. § 363(m) provides, in part: "[t]he reversal or modification on appeal of an authorization . . . of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith." The Court cannot consider an appeal of the sale of real property in a bankruptcy proceeding if the sale is moot under § 363(m). *See Cinicola v. Scharffenberger*, 248 F.3d 110, 127 n.19 (3d Cir. 2001) ("[W]e must first answer the question of statutory mootness before proceeding to the merits[.]"); *In re Pursuit*, 874 F.3d at 133; *Pittsburgh Food & Bev. Inc. v. Ranallo*, 112 F.3d 645, 647-48 (3d Cir. 1997) (explaining that § 363(m) is designed to promote finality).

In the Third Circuit, § 363(m) moots a challenge to a sale if: "(1) the underlying sale . . . was not stayed pending the appeal, and (2) the court, if reversing or modifying the authorization to sell, . . . would be affecting the validity of such a sale or lease." *Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc.*, 141 F.3d 490, 499 (3d Cir. 1998). Though framed as a two-part test, the court must also determine whether the buyer "purchased . . . [the] property in good faith." *Abbotts*

*Dairies*, 788 F.2d at 147; *Cinicola*, 248 F.3d at 122 ("[W]e have rejected a *per se* rule 'mooting appeals absent a stay of the sale . . . at issue.'"). Because neither the Bankruptcy Code nor the Bankruptcy Rules defines good faith, courts have adopted "traditional equitable principles, holding that the phrase encompasses one who purchases in 'good faith' and for 'value.'" *Abbotts Dairies*, 788 F.2d at 147 (citations omitted).

Here, SB did not obtain a stay, as it failed to convince me or the Third Circuit that a stay was appropriate. Further, it is undisputed that reversing the Bankruptcy Court's sale order would affect the validity of the sale, as "[a] challenge to an authorized transaction will necessarily impact that transaction's validity if it seeks to affect 'the validity of a central element,' such as the sale price." *Alabama Aircraft Indus., Inc.*, 514 Fed App'x. 193, 195 (3d Cir. 2013) (quoting *Pittsburgh Food & Beverage, Inc. v. Ranallo*, 112 F.3d 645, 649 (3d Cir. 1997)). SB also does not challenge whether Kitovsky is a good faith purchaser, *i.e.*, "the integrity of [his] conduct in the course of the sale proceedings" is not at issue. *Abbotts Dairies*, 788 F.2d at 147.

SB's sole basis for appeal is that Kitovsky did not purchase the Property for value at the auction. SB's arguments on this point are virtually identical to those raised before the Bankruptcy Court. First, SB claims that the Bankruptcy Court "applied the wrong legal standard in determining whether value was paid." Opp. Br., at 7. SB also points to alleged deficiencies in the Bankruptcy Court's factual findings. In particular, SB argues that the court did not "look beyond the mere result of the auction and measure the auction against some objective proof of fair value," or hear testimony from Zimmel and Berger as to the Property's marketability. *Id.* Finally, SB maintains that deficiencies in the auction's bidding environment depressed the sale price, including "an incorrect and inaccurate description of the sewer capacity status of the Property, [the fact that it took place] when much of New Jersey's commercial real estate [investors were] away on vacation

and could not attend, and [the fact that] it lasted only ten minutes among two bidders making only four total bids." Opp. Br., at 7, 12-14. In response, Atkinson argues that there is "ample evidence [in the record] that value was paid at the auction." *See* Mot. to Dismiss, at 6. Specifically, he points to "multiple certifications regarding the Property," which detailed the efforts to sell it prior to and during the auction, and a court-ordered valuation in 2014 that was performed soon after the Debtor applied for Chapter 7 proection. *Id.*

To begin, SB wholly fails to explain what was incorrect about the legal standard the Bankruptcy Court used to determine that Kitovsky paid value. *See* Opp. Br., at 7. It is clear from the record that the Bankruptcy Court applied the proper legal standard. The court made a specific finding of value on the basis of *Abbotts Dairies*, 788 F.2d at 148, and did not suggest that "an auction *per se* establishes value," despite SB's contention. *See* Dkt. 118. Consistent with *Abbotts Dairies*, the court found that, on the record before it, an auction "produces the best possible measure of fair value." Dkt. 118.  SB's argument in this regard lacks any basis.

Next, SB argues the Bankruptcy Court based its holding on inadequate factual findings, because it relied on the auction alone, and did not compare the sale price to "objective measures of value." Opp. Br., at 9. This argument is factually and legally unsupported. As a factual matter, in addition to the auction price, the Bankruptcy Court considered ample evidence, including: (1) the Auctioneer's Report detailing extensive advertising and marketing efforts; (2) a court-ordered valuation, filed on August 28, 2014, assessing the Property at $2,284,615.00; (3) the Debtor's own Amended Disclosure adopting the 2014 valuation and claiming a liquidation value of $1,484,999.75; (4) Iron Mountain's submission supporting the sale; (5) an email from Zimmel dated November 13, 2019, stating: "No one is going to buy the property for $4,500,000.00 or any other significant amount if they do not know that they have [sewage] capacity and a right to

7

continue the non-confirming industrial use . . . I don't even think you will obtain enough to pay the first mortgage whether [there] is an auction or not"; (6) submissions from Zimmel, Berger, and counsel for SB; and (7) testimony from Zimmel and Berger as to the value of the Property in a related hearing regarding its sewer capacity. These considerations form the basis of the Bankruptcy Court's order approving the sale, and the court properly weighed these facts. *See* Dkt. 118. Moreover, as a matter of law, a competitive public auction is "[g]enerally speaking . . . sufficient to establish that one has paid 'value' for the assets of a bankrupt." *Abbott Dairies*, 788 F.2d at 149. Finally, *Perona*, on which SB relies, is unpersuasive. As the Bankruptcy Court clearly explained, the purchaser at the auction in *Perona* was the debtor's President, with whom the debtor had an impermissibly "close relationship," and the property sold for less than the amount of an attached lien. Together these facts raised an inference that no *real* auction took place because of collusion. *Perona*, 186 B.R. at 140; *see also Abbott Dairies*, 788 F.2d at 149 (rejecting an auction on the basis of collusion); *In re Pursuit*, 874 F.3d at 137 (same). Not true here; there is no cogent evidence of impropriety in the present case that would undermine the integrity of the auction, raise an inference that it was "irregular[]," or establish the need for another measure of value. *See* Dkt. 118.

I also reject SB's contention that the Bankruptcy Court did not sufficiently consider the $5 million offer, which Zimmel solicited prior to Atkinson's decision to hold an auction. "Generally, unaccepted offers are not admissible evidence in support of fair market value of a property." *In re GGI Properties, LLC*, 588 B.R. 401, 417 (Bankr. D.N.J. 2018). Such offers are distinct from "unconsummated contract[s]," which carry more "evidentiary weight" and are more likely to reflect fair market value. *Id.* at 418. The $5 million offer, here, was not signed by both parties, which significantly reduced its probative value before the Bankruptcy Court. Even if the $5 million offer could be construed as an unconsummated contract, the Bankruptcy Court properly exercised

8

its discretion to "discount [the offer] as untested by due diligence." *Id.* Moreover, "an unconsummated contract is entitled to little or no weight in the absence of key information showing the likelihood that it is capable of being enforced." *In re Mocco*, 222 B.R. 440, 463 (Bankr. D.N.J. 1998). For example, "the more contingencies, the less weight to be given to the agreed-upon price, as the parties have reserved the opportunity to avoid the contract." *GGC Properties*, 588 B.R. at 419. Indeed, while a trustee has a duty to maximize value, he also has a duty to "avoid undue risk," *In re Buerge*, 479 B.R. 101, 107 (Bankr. D. Kan. 2012), such as the risk posed by a substantial contingency. *See In re Scimeca Foundation, Inc.*, 497 B.R. 753, 779 (Bankr. E.D. Pa. 2013). The $5 million offer in the present case is "replete with contingencies," which increased the likelihood that the buyer would opt out and that the contract would not be consummated. *GGC Properties*, 588 B.R. at 419 (quoting *Little Egg Harbor Tp v. Bonsangune*, 316 N.J. Super. 271, 281 (Super. Ct. App. Div. 1998)). As the Bankruptcy Court aptly concluded, these "perhaps insurmountable" contingencies entirely eliminated the offer's probative value. *Id.* (citing *Linwood Properties, Inc. v. Fort Lee Borough*, 7 N.J. Tax 320, 332-33 (1985) (construing such contracts as "not really contracts at all but . . . offers or options to purchase which deserve little or no weight in the valuation process")); *Mocco*, 222 B.R. at 463.

Neither did the Bankruptcy Court err in concluding that "offers in the amount of $7,000,000 and in excess of $7,000,000 for the purchase of the property," which the Debtor apparently received in 2014, had no probative value, because they, too, were "contingent on the successful resolution of the sewer capacity [litigation]," which SB cannot guarantee would produce a favorable result. Opp. Br., Berger Certification, ¶ 15. Finally, despite SB's assertions to the contrary, "the highest bid is not always the best bid," *United States v. Chemical Foundation*, 5 F.2d 191, 206 (3d Cir. 1925), *aff'd*, 272 U.S. 1 (1926), and "it [is] within the trustee's sound

9

business judgment to accept a somewhat lower . . . offer with no contingency." *In re JL Building, LLC*, 425 B.R. 854, 860 (Bankr. D. Utah 2011); *Scimeca*, 497 B.R. at 779.

Relatedly, SB argues that the Trustee hastily rejected the $5 million offer—and decided to sell the Property at auction—because the foreclosure stay that he negotiated with Iron Mountain would have expired during the prospective buyer's 45-day due diligence period. *See* Opp. Br., Berger Certification, ¶ 25. The implication SB seems to draw is that the looming foreclosure created "a compulsion to sell," which in turn lowered the auction price below fair market value. This argument is, however, without merit. The Bankruptcy Court made an affirmative finding that the Trustee acted in the best interests of the estate in choosing to conduct an auction. Dkt. 118; *In re ICL Holding Co.*, 802 F.3d 547, 551 (3d Cir. 2015) (approving the use of the "sound business purpose test" to judge a trustee's reasons for an asset sale); 11 U.S.C. § 704(a)(1) (stating that a trustee must "close [the] estate as expeditiously as is compatible with the best interests of parties in interest"); *see also Katchen v. Landy*, 382 U.S. 323, 328-29 ("[T]his Court has long recognized that a chief purpose of the bankruptcy laws is 'to secure a prompt and effectual administration and settlement of the estate of all bankrupts within a limited period.'") (quoting *Ex Parte Christy*, 3 How. 292, 312 (1845)). Indeed, the $3.2 million sale price was sufficient to fully pay all secured claims and unsecured creditors, leaving SB, the last-priority interest, with $100,000 to pay its debt obligations in a related bankruptcy proceeding. The Trustee was able to achieve this result even though Iron Mountain had obtained prior stay relief, and thus, had no obligation to other creditors, nor a duty to allow the Trustee any more time to pursue a sale. As such, on these facts, there is no factual basis to disturb the Bankruptcy Court's finding that the Trustee's decision to sell the Property at auction was proper, nor do these facts establish that the Trustee did not use reasonable efforts to maximize the sale of the Property. *See In re Martin*, 91 F.3d 389, 394 (3d Cir. 1996).

10

SB further argues that, "[c]onsistent with the need for some objective measure of value," the Bankruptcy Court should not have approved the auction sale, because there is no appraisal on record against which to compare. Opp. Br., at 5, 10-11. SB points to both *Abbotts Dairies* and *Perona* for support. This argument, too, is factually and legally unsupported. I note that there is, in fact, an appraisal on record, ordered by the Bankruptcy Court in 2014. Compared to that appraisal, the auction price is 40% more. Even if the Court assumes that this appraisal is "stale" because market conditions have changed, neither *Abbotts Dairies* nor *Perona* supports SB's position. The *Perona* Court remanded that case for various reasons, only one of which was the absence of an appraisal. The primary ground was collusion, which tainted the auction and created "irregularity in[] the auction price." Dkt. 118. More importantly, although *Abbotts Dairies* advised that an asset in a bankruptcy proceeding is purchased for value when it is sold at 75% of its appraised value, the Third Circuit has neither mandated appraisals nor required an auction's price to be judged against an otherwise pegged asset value. Quite to the contrary, "[w]here no appraisal has been secured, a public auction conducted adequately has been found to establish that value was paid." *In re Lehigh Valley Professional Sports Club, Inc.*, 2002 WL 1349586, at *4 (Bankr. E.D. Pa. June 6, 2002) (holding that "an appraisal provided at the inception of the case was so off the mark as to be disregarded," but value was paid nonetheless) (citing *Abbotts Dairies*, 877 F.2d at 149)).

Finally, SB contends that the auction was not competitive, because it was conducted during the holidays. The Bankruptcy Court properly rejected this argument. Despite the timing, seventy-seven prospective buyers registered on the auctioneer's website after the auctioneer engaged in extensive marketing and advertising. Twenty-two people inspected the Property. Fifteen potential buyers delivered $150,000 to the auctioneer in order to bid on the Property. In the end, there were

five bids from three bidders, despite the Trustee's strategic decision to start bidding at a high price. As the Bankruptcy Court correctly held, given these facts, the auction was competitive, which "strongly indicates that [Kitovsky] paid appropriate value for estate assets." *In re Pursuit*, 874 F.3d at 137.

Still, SB argues, a "material inaccuracy and omission[] in the auctioneer's marketing materials [] directly affected the marketability of the Property" at auction, depressing its price. Opp. Br., at 12. Because the Property operates on a small septic tank, which is insufficient to support industrial use or commercial development, the Debtor has sued to gain access to the public sewer system. After eight years of litigation, the case is on remand from the New Jersey Supreme Court, with no indication of how long it will last. *See* Dkt. 118; Opp. Br., Berger Certification, ¶ 15. The auctioneer's report did not include such information, stating only that "[t]he sewer capacity issue . . . includes: the septic system not currently working and may not be functioning, that if it does function or can be fixed – it can only service the needs of 30 people (limiting occupancy and use of the building), and that no other solution to expand capacity is readily apparent and/or practical." Opp. Br., Berger Certification, ¶ 15. The Court agrees with the Bankruptcy Court that the auctioneer's statement is neither inaccurate nor misleading. The auctioneer simply notified prospective buyers of the present condition of the Property—that it operates by septic, no more or less, which is a true description to this day. That description also accurately captures the "as-is condition" in which the Property was on the market. Far from better informing prospective buyers, relying on SB's mere "confidence" that it will eventually obtain access to public sewage would prematurely lend credence to the litigation that has lasted the better part of a decade. As the Bankruptcy Court pointedly noted, "it is detrimental to all creditors to have to wait until endless litigation is pursued." Dkt. 118.

In sum, there is sufficient evidence in the record to support the Bankruptcy Court's finding that Kitovsky paid value for the Property. The Bankruptcy Court also did not commit clear error by disregarding SB's proposed measures of value. SB's appeal is, therefore, moot under 11 U.S.C. § 363(m), and the Court **GRANTS** the Motion to Dismiss. Because the Court finds that SB's appeal is moot, the Court orders the Notice of *Lis Pendens* to be discharged.

**DATED**:  July 27, 2020                                      /s/ Freda L. Wolfson
                                                                Freda L. Wolfson
                                                                U.S. Chief District Judge